Thomas R. BRUNNER, as Trustee for
Mid-Continent Securities Co.,
Inc., Plaintiff,

v.

R. C. ROUNDS, Defendant, and
Third-Party Plaintiff,

v.

Donald H. ALLDRITT, et al.,
Third-Party Defendants.

Civ. A. No. W–5394.

United States District Court,
D. Kansas.

Feb. 6, 1975.

William Porter, Wichita, Kan., for plaintiff Brunner.

Malcolm Miller, Wichita, Kan., for defendant R. C. Rounds.

Stephen J. Blaylock, Wichita, Kan., for third party defendant.

## ORDER ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

WESLEY E. BROWN, Chief Judge.

Plaintiff, Thomas R. Brunner, serves as liquidating Trustee for Mid-Continent Securities Company, pursuant to the provisions of the Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq., and by appointment of this Court, pursuant to Order entered January 3, 1972 in *Securities and Exchange Commission et al. vs. Mid-Continent Securities Company, Inc., et al.,* Civil Action No. W–4769.

This action is brought to enforce the provisions of a certain subordination agreement dated April 8, 1970, between the defendant R. C. Rounds and Mid-Continent Securities wherein Rounds turned over possession to Mid-Continent, 4,000 shares of stock of the Georgia Pacific Corporation. Plaintiff alleges that in April, 1971, at a time when Mid-Continent was in perilous financial condition, defendant Rounds wrongfully regained possession of the Georgia-Pacific shares, all to the detriment and damage of the corporation's creditors. It is alleged that the stock in question was of the value of $228,000, and plaintiff Trustee demands judgment against defendant Rounds for the fair market value of the securities.

Rounds admits the existence of the subordination agreement, and admits that on April 14, 1971 he regained possession of 2,000 of the shares, and that the remaining 2,000 shares were returned to him on or about May 13, 1971. He disputes however, the validity of the subordination agreement in the first instance, alleging that it was void and of no effect because of fraudulent statements and concealments which induced him to enter into the agreement and by reason of various violations of federal and state securities laws and regulations by Mid-Continent and its officers and agents. Rounds further contends that he is not liable to the Trustee because the subordination contract was for a one-year term, that it expired on April 7, 1971, and the securities were thereafter properly returned to him. He further contends that the Trustee's action against him is barred by reason of a settlement and compromise agreement between the Trustee, Donald and David Alldritt, officers of Mid-Continent, and other third parties in connection with a certain cross-claim filed by the Trustee in the SEC litigation, Case No. W–4769.

The defendant Rounds has filed a third party complaint in this action against David Alldritt, Donald Alldritt and Maxine Alldritt, as third party defendants, wherein it is alleged that if Rounds should be found liable to the Trustee on account of the transfer of Georgia Pacific Shares, then the Alldritts, who were officers, directors, and/or controlling stockholders of Mid-Continent, are liable over to him because of various violations of federal securities law and regulations, and other wrongful acts involving their management and control of Mid-Continent.

The third party defendants Alldritt deny liability to Rounds, and have, in turn, filed a counterclaim and cross-claim against plaintiff Trustee, which, in effect, "completes the circle." The Alldritts claim that if Rounds is liable to the Trustee, and the Alldritts are liable to Rounds on his third party complaint, then the Trustee, in turn, is liable to the Alldritts by reason of the provisions contained in the Compromise Agreement which the Trustee made with the Alldritts and others in settlement of his cross claims in the SEC litigation, Case No. W–4769.

Now before the Court are the Motions of defendant Rounds, and third-party defendants Alldritt to Dismiss the Trustee's Action, and/or for Summary Judgment. [Dkts. 17, 20.] These motions require a determination of the nature and effect of the Compromise Agreement between the Trustee, the Alldritts and others in connection with the SEC litigation, together with an analysis of the nature and effect of the one-year subordination agreement between Rounds and Mid-Continent under federal securities law and regulations. Before discussing the merits of the Motions, it is necessary to briefly review several relevant factors which pertain to the SEC action

against Mid-Continent and the Alldritts, which is presently pending before this Court.

*Securities and Exchange Commission et al. v. Mid-Continent Securities Co., Inc. (D.C.Kan) No. W–4769*

On January 3, 1972, the Securities and Exchange Commission and the Securities Investor Protection Corporation filed suit in this Court against Mid-Continent Securities Company, Inc., and its officers and directors, Donald Alldritt, David Alldritt and Maxine J. Alldritt, alleging various violations of federal securities law and SEC regulations. The Commission and the Securities Investor Protection Corporation sought a liquidating Trustee for the broker-dealer, pursuant to the Securities Investor Protection Act of 1970, 15 U.S.C.A. § 78aaa et seq., and on the same date, plaintiff in this action, Thomas R. Brunner, was appointed Liquidating Trustee for Mid-Continent Securities.

The Trustee has recently filed his report to the Court concerning his management in liquidation of Mid-Continent Securities. [Dkt. 249, Case No. W–4769.] This report reveals a sorry, dismal series of events which have caused the Securities Investor Protection Corporation to pay out $752,457 to reimburse customers for securities which were supposed to be held in safekeeping by Mid-Continent, but which were not found by the Trustee, and an additional sum of $136,635 to enable the Trustee to pay free credit balances due other customers. It ap-

pears that for a number of years Donald Alldritt had used the assets of Mid-Continent to finance numerous unsuccessful business ventures of his own, and that as a result, on January 3, 1972, these various entities owed Mid-Continent over $416,-000.00 It further appears that Donald Alldritt commonly used his personal name as Mid-Continent's trading name in connection with security transactions, and at various times used securities belonging to customers to secure corporate loans. When Rounds withdrew his Georgia Pacific stock in April, 1971, then valued at approximately $225,000 the situation at Mid-Continent rapidly worsened, and in order to pass examination by certified public accountants on the final day of the fiscal year, September 30, 1971, various false entries were made in records covering customers' sales, and a check kiting scheme was set up for purposes of inflating the corporate bank account. Due to the negligence, ignorance, and/or inexperience of the auditors, the accountant prepared and filed reports with the SEC indicating that Mid-Continent had a net worth of $72,656.01 on September 30, 1971, when in fact the company was bankrupt.[1]

On September 5, 1972, as a result of his administration in liquidation of Mid-Continent Securities, the Trustee filed a cross-claim for damages totalling $834,193.10, against Donald H. Alldritt and David Alldritt in Case No. W–4769. Count I of this claim sought judgment against the Alldritts in the sum of $416,193.10, representing funds wrongfully misappropriated from

---

1. The accountant accepted a figure of $354,188 at Boulevard State Bank as the balance on hand at the end of the fiscal year, without looking further into the account. On September 30, 1971, the Alldritts deposited checks of $139,000 and $177,000 written on personal and other business accounts in the account of Mid-Continent, but these transactions were reversed the following day, leaving only a small balance in the account.

    Also, on September 30, 1971, false entries were made in a customer's records showing sales to Mid-Continent of Pennzoil and Braniff stock in the sum of $501,677.13 (which Mid-Continent was short), and a purchase of 50,000 shares of Sunlite Oil by this same customer for $501,677.13, thus giving this account a zero

balance and improving Mid-Continent's "long and short position."

The Alldritts also convinced the accountant that the 4,000 shares of Georgia Pacific stock were still on hand, and that in addition $25,000 in City of Abilene bonds were on hand in connection with another subordination agreement, although in fact the bonds had never been in the possession of Mid-Continent. For some unknown reason, the accountant failed to demand proof of possession of these securities and failed to make a proper physical count of securities on hand.

The accounting firm which conducted the audit has settled a claim made by the Trustee based upon negligence in conducting the audit.

Mid-Continent for the purpose of financing other business enterprises owned by the Alldritts.[2]

Count II of the cross-claim concerned the 4,000 shares of Georgia Pacific Corporation held under the subordination agreement with Rounds. The Trustee alleged that the Alldritts had wrongfully turned over possession of this stock to Rounds, in violation of the terms of the subordination agreement, and at a time when Mid-Continent was in a net capital deficiency status.

Count III concerned fraudulent entries in the books and records of the company in connection with the 1971 audit, and the Trustee claimed the sum of $198,000 in damages due to financial losses sustained by the company between November 1, 1971 and January 3, 1972, when the business was finally closed down by the SEC.

On July 27, 1973, the Trustee moved to compromise his claim for $834,193.10 against Donald and David Alldritt. [Dkt. 214.] This motion recited the fact that these persons had diverted corporate funds to various entities owned or controlled by them; that the likelihood of any recovery from these various companies was problematical at best; that likewise, it was doubtful if any substantial recovery could be had against the Alldritts personally since they owned only nominal non-exempt, assets, and the Trustee proposed a compromise wherein certain relatives of the Alldritts would pay over $135,000 cash, in return for a dismissal of the cross-claim against the Alldritts and the execution of a covenant not to sue the Alldritts, one L. D. Banta, a relative, or any of the firms and corporations indebted to the Mid-Continent corporation.

On August 28, 1973, the Court approved the compromise, dismissed the Trustee's cross-claim against the Alldritts, with prejudice, and ordered the Trustee to execute the proposed covenant not to sue. [Dkt. 219.] Subsequently, the Trustee executed the covenant for the benefit of Donald, David and Maxine Alldritt, L. D. Banta, and the corporations and entities heretofore referred to in fn. 2, supra. The Trustee agreed "to forever refrain and desist from instituting or asserting against them any claim, demand, action or suit of whatever kind or nature, either directly or indirectly, for recovery or claim arising out of or having any connection with the debtor corporation, Mid-Continent Securities Co., Inc., or the conduct of Donald H. Alldritt or David A. Alldritt while acting in connection with said debtor, or arising out of the affairs of said debtor corporation in any manner or way whatsoever." In this agreement, *the Trustee expressly reserved the right "to sue any other person or persons against whom he may have or assert any claim arising out of the above described matters."*

### The Motions to Dismiss or for Summary Judgment

#### A. Effect of Covenant Not to Sue

■ In their motions, the defendant Rounds, and third party defendants Alldritts urge that this action must be dismissed because the Trustee has agreed not to sue the Alldritts "directly or indirectly" for claims arising from their management of Mid-Continent Security, and that the Trustee, in dismissing the portion of his claim against the Alldritts relating to transactions involving the Georgia Pacific Shares, has thereby relinquished any claim he may have against the defendant in this action, R. C. Rounds.[3]

Such allegations are clearly without merit. In the covenant not to sue the Trustee expressly reversed his right to proceed

---

2. $362,500 of this sum had been advanced to Precision Contours, Inc., a corporation owned by the Alldritts. Other business ventures were: Ceramics of Kansas, Computer Graphics, Inc., Diversified Avionics, International Products, Madera Gas & Oil; Maxdon Associates; Therman Industrial Products; Triple R Distributors; and United Systems of America.

3. The Motion to Approve Compromise was directed solely towards the indebtedness of Alldritt-owned corporations to Mid-Continent. No part of the settlement figure of $135,000 was mentioned in connection with the transaction involving the Georgia Pacific Shares. The Trustee's claims against the Alldritts, however, were dismissed in their entirety.

against third parties. Defendant Rounds was not a party to the agreement made with the Trustee, and he is not entitled to plead this agreement as a bar to any action against him.

It is likewise clear that the Alldritts may not rely upon the Trustee's covenant to avoid whatever liability they may have toward a third party, in this instance, third party plaintiff R. C. Rounds. The third party complaint is based upon the allegation that the Alldritts, by means of fraud, concealment, and violation of federal securities legislation, caused defendant Rounds to enter into the subordination agreement, to his damage. The defendant R. C. Rounds has not released the Alldritts from any obligations owing to him personally, and the Trustee has not done so on his behalf.

The simplistic argument of the Alldritts to the effect that the Trustee has somehow violated his covenant not to sue by proceeding in this action against Rounds is likewise without merit. This action is based upon the alleged wrongful act of Rounds, personally, in retaking possession of the Georgia Pacific Shares. It is not an action, directly, or indirectly against the acts of the Alldritts with respect to the securities in question. Rounds' liability, if any, is personal, and not derivative.

### B. *Termination of the Subordination Agreement*

As an additional ground for dismissing this action, defendant R. C. Rounds contends that the subordination agreement indicated, upon its face, that it was for a one-year term, that it expired in and of itself at the end of that one year term on April 7, 1971, and that therefore Rounds' retaking possession of the Georgia Pacific shares after that date, was entirely lawful and proper with respect to the claim of the Trustee in this action.

Subordination agreements are not uncommon in the securities business. The subordinated lender lends cash or securities to a broker-dealer, agreeing that his claim is subordinate to the claims of other creditors and customers of the broker-dealer.

Such cash or securities become a part of the risk capital of the broker-dealer, and pursuant to SEC regulations, they may be considered as assets, without including the obligation to the lender as a liability, for the purpose of ascertaining the broker's "net capital position." See 17 C.F.R. § 240.15c3–1.

The agreement between Rounds and Mid-Continent, dated April 8, 1970, was for a term of one year. The agreement also contained the following terms: (Party of the First Part is R. C. Rounds; Party of the Second Part is Mid-Continent Securities Co., Inc.): [Ex. A, Dkt. 22].

"A. Party of the first part agrees to subordinate any right to demand or receive payment or return of the cash or security loaned to the claims of all present and future creditors of the party of the second part.

B. Party of the first part agrees that this agreement is not subject to cancellation at the will of either party, and is for the term of one year from the date of this agreement.

C. Party of the first part agrees that this agreement shall not be terminated or rescinded or modified by the mutual consent or otherwise, if the effect thereof would be to make the agreement inconsistent with the conditions of SEC general rules and regulations of the Securities Exchange Act of 1934, 240–15c–3–1, or to reduce the net capital of the party of the second part below the amount required by the above mentioned SEC Section.

\* \* \* \* \* \*

F. Party of the first part agrees that these securities loaned to party of the second part pursuant to its provisions may be used and dealt with by party of the second part as part of its capital and shall be subject to the risk of the business."

The terms and conditions of subordination agreements are specifically regulated by the Securities and Exchange Commis-

sion. 17 CFR 240.15c3–1 which governs net capital requirements for brokers and dealers, provides that certain liabilities of the broker may be excluded in computing a net capital position when they "are subordinated to the claims of general creditors pursuant to a satisfactory subordination agreement, as hereinafter defined;" Part (7) of this regulation defines the term:

"(7) The term 'satisfactory subordination agreement' shall mean a written agreement duly executed by the broker or dealer and the lender, which agreement is binding and enforceable in accordance with its terms upon the lender . . . and which agreement satisfies all of the following conditions:

(i) It effectively subordinates any right of the lender to demand or receive payment or return of the cash or securities loaned to the claims of all present and future creditors of the broker or dealer;

(ii) The cash or securities are loaned for a term of not less than one year;

(iii) It provides that the agreement shall not be subject to cancellation by either party, *and that the loan shall not be repaid and the agreement shall not be terminated, rescinded or modified by mutual consent or otherwise if the effect thereof would be to make the agreement inconsistent with the conditions of this section or to reduce the net capital of the broker or dealer below the amount required by this section* ;

\* \* \* \* \* \*

(vi) It provides that any securities or other property loaned to the broker or dealer pursuant to its provisions may be used and dealt with by the broker or dealer as part of his capital and shall be subject to the risks of the business; . . . ." [Emphasis supplied.]

Subordination agreements executed pursuant to Reg. No. 240.15c3–1 must be filed with the Regional Office of the Securities Exchange Commission within ten (10) days after they are made.

With reference to Rounds' contention that the subordination agreement in question was self-terminating, and expired automatically at the end of the one year period, the Court has carefully considered the briefs of the parties on the issue, together with the opinion of the Southern District of New York, *Securities & Exch. Com'n v. Kelly Andrews & Bradley, Inc.*, (S.D.N.Y. 1972) 341 F.Supp. 1201; and copies of opinions furnished to the court of pertinent decisions, *In the Matter of Smith & Medford Incorporated*, Civil Action No. 18405 (In Liquidation under Securities Investor Protection Act of 1970) (U.S.D.C.No. Dist.Ga. 7/30/74); [Ex. C, Dkt. 22] and *Wisnouse v. Steven Telsey et al.*, No. 73, Civil 1256, (Southern Dist. N.Y. 11/8/73) (Ex. B, Dkt. 18). All three of these cases involved the question of the lender's right to reclaim securities transferred under subordination agreements regulated by the SEC.

In the *Kelly Andrews & Bradley* case, S.D.N.Y., 341 F.Supp. 1201, the SEC brought charges against a lender under the antifraud provisions of the Securities Exchange Act of 1934. The lender there was found to have committed fraud when, with the aid of a director of the broker, he regained possession of, and appropriated to his own use stock subject to a subordination agreement, which act caused the broker to cease operations because of its failure to meet the "net capital rule." The subordination agreement in this case ran from April 15, 1971 to April 15, 1972, and the evidence established that the lender regained possession of the shares in October, 1971, two days before the broker was suspended from operations. The decree in this case required the lender to surrender possession of the securities to the court-appointed trustee for the benefit of the broker's customers and creditors.

In the *Wisnouse* case, the subordination agreement was made on May 17, 1971, with a "maturity date" of May 17, 1973. In September, 1971, the broker was involved in financial difficulties, and the securities were sold. On March 27, 1973, the lender commenced an action against the broker for breach of the subordination agreement, and to recover the value of his securities. At

the time the Court ruled upon the merits of his claim, the term of the subordination agreement had expired. The Court found that the lender's securities had been rightfully sold in an orderly liquidation of the brokerage firm, and that he was entitled to judgment against the broker, subordinated however, to claims of general creditors and customers. At p. 5 of the unpublished opinion [Ex. B, Dkt. 18] the Court stated:

"The maturity date of the loans, May 17, 1973, having passed, plaintiff was entitled upon demand to the return of his securities or their value *subject, of course, to the priority claims of creditors as of May 17, 1973.*"

█ In the *Smith & Medford* case [Ex. C, Dkt. 22], the broker-dealer was in liquidation under the Securities Investor Protection Act, as is Mid-Continent in this case. At issue was the claim of a customer-lender, who had turned over securities to the firm under a one-year subordination agreement dated May 31, 1972. The claimant contended that the outside effective limit of the agreement was one year from May 31, 1972; the Trustee in liquidation claimed that the subordination agreement conditioned the return of securities absolutely, and prevented the return, either within the one year period or thereafter, if the effect of the return would place the broker in net capital deficiency. The Court found that the "net capital position" of the broker was a consideration, even after the one year term of the agreement had expired, and that return of securities subject to such agreement was absolutely conditioned upon the effect of the return upon that net capital position. Evidence offered by the Trustee established that the net capital position of *Smith & Medford* was impaired at the expiration of the agreement, and the Court ruled that the customer's claim had been properly denied.

In his reply brief in this action, defendant Rounds points out that the language in his subordination agreement omitted the phrase "and the loan shall not be repaid", which was found in the *Smith & Medford* agreement as follows: "This agreement is not subject to cancellation by either party and the loan shall not be repaid and this agreement shall not be terminated, rescinded or modified by mutual consent or otherwise, if the effect thereof would be to make this agreement inconsistent with the conditions of Rule 17 CFR 240.15c3–1 under the Securities Exchange Act of 1934, or to reduce the net capital of the borrower below the amount required by said rule . . ."

█ The Court does not believe this omission is determinative of the issue involved in Rounds' Motion to Dismiss or for Summary Judgment. The language which was omitted in the Rounds' subordination agreement was required to be included, pursuant to ¶(iii), Part 7, Regulation § 240.15c3–1, quoted above, and upon its face, it is clear that the Rounds-Mid-Continent Agreement was executed, was filed, and was to be performed in accordance with this SEC Regulation. It may be that at trial evidence may be offered by Rounds' third party complaint against the Alldritts to explain any discrepancies which appear in the Rounds' subordination agreement which would except that agreement from the requirements the SEC imposes upon "satisfactory subordination agreement," as defined by regulation. The question of whether or not Mid-Continent was in a position of "net capital deficiency" at the time Rounds' securities were repossessed of course involves factual issues upon which the Trustee bases his claim and which may not be determined at this time upon a Motion to Dismiss, or for Summary Judgment.

For the foregoing reasons, the Court concludes that the Motions of defendant Rounds and third party defendants Alldritt to Dismiss this action, or for Summary Judgment should be overruled. Accordingly,

IT IS ORDERED that the Motion of Defendant Rounds to Dismiss this Action or for Summary Judgment, should be, and it is, hereby Overruled.

IT IS FURTHER ORDERED that the Motion of Third Party Defendants Alldritt to Dismiss the Complaint, or for Summary

Judgment, should be, and it is, hereby Overruled.

The Clerk is directed to submit the file to the United States Magistrate for Pre-Trial.