736 P.2d 1348

**Dennis CULP and Roger Newton, Plaintiffs-Respondents,**

v.

**TRI–COUNTY TRACTOR, INC., Defendant-Appellant.**

No. 16152.

Court of Appeals of Idaho.

April 9, 1987.

Laird B. Stone (Nelson, Rosholt, Robertson, Tolman & Tucker), Twin Falls, for defendant-appellant.

J. Walter Sinclair (Benoit, Alexander, Sinclair, Harwood & High), Twin Falls, for plaintiffs-respondents.

## SUBSTITUTE OPINION

Upon Denial of Petition for Rehearing

This opinion supersedes the Court's prior opinion dated August 22, 1986.

BURNETT, Judge.

This case presents difficult issues of law and equity relating to subordination agreements. The central question is whether subordinated promissory notes may be deemed in default, and accelerated, while a senior obligation remains outstanding. The district court answered this question in the affirmative and entered judgments for the holders of the notes. For reasons explained below, we vacate the judgments and remand the case.

The material facts are undisputed. In 1982 Dennis Culp and Roger Newton were officers of Tri-County Tractor, Inc. During that year Culp and Newton each loaned Tri-County $20,000. The loans were evidenced by unsecured promissory notes bearing annual interest at nine percent. Several weeks later Tri-County borrowed additional money from the Idaho First National Bank. In connection with this transaction, Culp and Newton signed identical agreements subordinating their notes to the bank loan.

Each subordination agreement consisted of seven paragraphs, five of which may be summarized here. The first paragraph described the subordination in general terms, stating that "any and all claims of the bank against [Tri-County] ... shall be and the same are hereby declared to be first and prior to any and all claims of [Culp and Newton]...." Paragraph two provided

that subordination was not contingent upon any future event. It said that each agreement "is hereby declared to be of full force and binding effect whether or not [Tri-County] is or becomes insolvent...." The third paragraph contained an assignment by Culp and Newton to the bank of their claims against the corporation, "for the purpose and to the extent" of the subordination. Paragraph four provided that *"as long as this agreement shall remain in effect,* no assets of the debtor shall be transferred and *no payment shall be made to or received by [Culp and Newton] without the written consent of the bank being first obtained...."* (Emphasis added.) The fifth paragraph provided that the agreement would remain in effect "so long as [Tri-County] is in any manner indebted to the bank ... or *until [Culp and Newton] in writing notify the bank of the termination thereof,* in which event any indebtedness ... owing by [Tri-County] to the bank at the time ... of such notice shall be and is hereby declared to be superior and prior to the claim of [Culp and Newton]." (Emphasis added.)

On March 1, 1985, an interest payment came due on the notes.[1] Tri-County did not make the payment. Culp and Newton, who had ceased serving as officers of Tri-County, claimed that the nonpayment constituted a default. They demanded the accelerated balance on each note, together with accrued interest. Subsequently, on April 22, 1985, they notified the bank that they were terminating the subordination agreements. The record does not disclose when Tri-County received word of the termination. It reveals only that on April 24, two days after notifying the bank, Culp and Newton sued Tri-County for all sums due or to become due under the notes. The bank was not made a party to the suit. Although it was aware of the litigation, the bank did not seek to intervene. When the

1. The notes provided for annual interest payments from 1984 through 1988, followed by five annual payments of principal and interest from 1989 through 1993. For reasons not clear from the record, Tri-County made the first interest payments when they came due in 1984. As

indicated by today's opinion, these payments apparently violated the subordination agreements. However, no issue concerning the 1984 payments has been raised in this appeal. Consequently, our focus is limited to the payments scheduled in the notes, but not made, in 1985.

district court entered judgments for Culp and Newton, Tri-County appealed.[2]

In Part I of the following analysis, we identify the legal relationships created by the notes and subordination agreements. We address the question of default in two time frames: when interest payments came due on March 1, 1985, and when the subordination agreements were terminated. In Part II of our opinion we explain why equity will not permit us to find a default in light of circumstances portrayed by the present record.

## I

We begin by noting the general thrust of a subordination agreement: "It is the subordination of the right to receive payment of certain indebtedness (the 'subordinated debt') to the prior payment of certain other indebtedness (the 'senior debt') of the same debtor." Calligar, *Purposes and Uses of Subordination Agreements*, 23 BUS.LAW. 33, 33 (1967). A subordination agreement may be "inchoate" or "complete." An inchoate subordination is triggered by a future event specified in the agreement, such as insolvency or bankruptcy of the debtor. When subordination is "inchoate," payment of the subordinated debt is not restricted unless and until the triggering event occurs. In contrast, a "complete" subordination permits no payment to be made on the subordinated debt at any time while the senior debt remains outstanding. In other words, a "complete" subordination is effective immediately. *Id.* at 35.

The subordination agreements in this case were "complete" when executed. They did not await some triggering event; they were effective immediately. Until terminated, the agreements prohibited Tri-County to make, or Culp and Newton to receive, any payments on the notes unless the bank gave its consent. The agreements were in full force, and had not been terminated, when the interest payments came due on March 1, 1985.

## A

The initial question framed by these facts is whether Tri-County's failure to pay interest when it came due constituted an act of default. On March 1, 1985, as we have seen, the bank loan was still outstanding, the subordination agreements were in force, and the bank had not given Tri-County consent to pay Culp and Newton. Payment in those circumstances would have violated the subordination agreements. Failure to perform a prohibited act cannot be treated as an event of default. Consequently, the corporation's failure to pay interest on March 1, 1985, afforded Culp and Newton no immediate basis to sue on the notes. *Cf. P.M. Finance Corp. v. Commissioner of Internal Revenue*, 302 F.2d 786 (3rd Cir.1962) (observing that a "complete" subordination destroys a creditor's power to demand payment at a fixed maturity date); *Standard Brands, Inc. v. Straile*, 23 A.D.2d 363, 260 N.Y.S.2d 913 (1965) (holding, in the case of "complete" subordination, that no action lies against the debtor, but that a separate action may lie against a guarantor).

Culp and Newton have argued that Tri-County had no standing to invoke the subordination agreements as a defense to their claims of default. They maintain that the subordination agreements were intended to protect the bank, not to benefit Tri-County. We concede that the agreements were intended to protect the bank, but the fact remains that such protection was created by altering the rights and duties embodied in the promissory notes. Tri-County and Culp or Newton, respectively, signed the subordination agreements and agreed to comply with their terms. Each agreement, as we have stated, directed Tri-County to make no payment to Culp or to Newton until its obligation to the bank had been satisfied or until the bank consented. Tri-County was entitled to invoke these agreements as a defense to claims that it de-

---

**2.** Culp and Newton filed separate complaints and eventually obtained separate judgments. The cases were consolidated by the district court and have been presented to us in a single appeal.

faulted by failing to pay interest on March 1, 1985.

█ Culp and Newton next contend that although the subordination agreements might preclude collecting a judgment on the notes without the bank's consent, they do not bar reducing the notes to judgment. We acknowledge that some agreements broadly subordinating debts to the claims of all other creditors have been construed to allow procurement of judgments even though collection may be deferred. *See, e.g., Wisnouse v. Telsey,* 367 F.Supp. 855 (S.D.N.Y.1973) *and Commercial Mortgage & Finance Corp. v. North American Investors, Inc.,* 111 Ga.App. 355, 141 S.E.2d 768 (1965) (both cases involving general subordinations to "all present and future creditors"). However, those authorities are inapposite here. The subordination agreements in this case did not merely bar collection of judgments. They expressly prohibited any payment by the debtor (Tri-County) to certain subordinated creditors (Culp and Newton) until the agreements were terminated or until the senior creditor (the bank) gave consent. As we have explained, failure to make a payment that was prohibited on March 1, 1985, could not be characterized as a default. Absent a default, there would be no basis for suit or for the entry of judgments.

In rendering judgment for Culp and Newton, the district judge took a different view of the default question. He suggested that Tri-County could, and should, have made the 1985 interest payments to the bank. Although the judge cited no particular provision of the subordination agreements in support of this suggestion, we surmise that he was thinking of paragraph three. That paragraph, it will be recalled, contained assignments to the bank by Culp and Newton of their claims against the corporation. Although this paragraph arguably would have allowed the bank to receive payments on the notes—and ultimately to furnish an accounting to Culp and Newton—the paragraph imposed no duty upon the corporation to make such payments nor any obligation upon the bank to collect them. The object of paragraph three, as we read it, simply was to provide the bank additional security with respect to the subordination, particularly in the event of bankruptcy. *See generally* Calligar, *Subordination Agreements,* 70 YALE L.J. 376, 395–98 (1961) (hereinafter *Subordination Agreements* ). It did not provide a mandatory alternative method of paying the notes. Moreover, the record does not indicate that the bank ever exercised any purported right to demand such payments. Accordingly, we hold that no default occurred upon Tri-County's failure to pay interest on March 1, 1985.

B

We now turn to a broader inquiry. Culp and Newton have argued, in their original brief and in briefs supporting a petition for rehearing, that the default issue does not turn exclusively upon circumstances existing on March 1, 1985. They contend that the obligation to pay interest was continuing in nature and that it became enforceable when the subordination agreements were terminated on April 22, 1985. This contention is consistent with the principle that subordinated obligations are deferred, not excused. As stated by Calligar, "The subordinated debt is still due and payable according to its terms.... [P]ayments on the subordinated debt are deferred in accordance with the terms of the subordination agreement...." *Subordination Agreements* at 382.

In contrast, Tri-County asserts that unilateral termination by Culp and Newton had no effect on subordination of the notes to the debt then owed the bank. Rather, Tri-County urges, the sole effect of such unilateral termination was to prevent the promissory notes from becoming subordinated to any additional loans subsequently made by the bank to Tri-County. From our reading of the limited literature and case law on this subject, it appears that Tri-County's argument accurately reflects the typical pattern of subordination agreements.

Very often the complete subordination agreement takes the form of a continuing agreement covering then existing

and all future indebtedness of the debtor to the subordinator, and it will subordinate such indebtedness to both existing and future financial accommodations of the bank to the borrower. Such an agreement will provide for termination only after due notice is given to the bank and only as to loans and extensions of credit made by the bank to the borrower after the bank's receipt of such notice of termination.

*Subordination Agreements* at 381.

However, the agreements at issue in this case are not typical. Indeed, our research has disclosed no other reported case dealing with language similar to that contained in paragraph five, the termination paragraph, of these agreements.[3] The pertinent language, quoted above and set forth again here for convenience, is as follows:

[Each agreement is] in continuing force and effect so long as [Tri-County] is in any manner indebted to the bank ... *or* until the undersigned shall in writing notify the bank of the termination thereof, *in which event* any indebtedness ... owing by [Tri-County] to the bank shall be and is hereby declared to be *superior and prior* to the claim of [Culp or Newton]. [Emphasis added.]

This language is clear and unambiguous. It lends no support to the notion that termination affects only future debts. Rather, it literally says, without qualification, that each subordination agreement becomes ineffective upon termination. Thereafter, the debt owed the bank is simply considered "superior and prior" to the notes.

▇▇▇ Unambiguous contracts must be interpreted as written. *E.g., J.R. Simplot Co. v. Chambers*, 82 Idaho 104, 350 P.2d 211 (1960). So far as our research discloses, "superior and prior" is not a recognized term of art with a specialized meaning in subordination agreements. At most, it echoes the tenor of inchoate agreements. *Subordination Agreements* at 379. Thus, if a future event such as Tri-County's bankruptcy were to place the bank in competition with Culp and Newton for a limited source of funds, the bank would enjoy a preferred position. But we have not been furnished, nor can we find, any authority or logical foundation for holding that the phrase "superior and prior" contains an immediate prohibition against a debtor making payments without the senior creditor's consent. We hold that the subordination agreements in this case imposed no such immediate prohibition after they were terminated.

## II

It is one thing to say, as we do, that payments on the notes were no longer prohibited after Culp and Newton terminated the subordination agreements. But it would be quite another thing to say, as Culp and Newton further argue, that Tri-County's failure to make the 1985 interest payments while the agreements were in force ripened automatically into an actionable default upon termination. In support of this argument, Culp and Newton point to the acceleration clause of the promissory notes: "If any of said installments are not so paid, the whole of said principal and interest will become *immediately* due and collectable...." [Emphasis added]. They also rely upon an express waiver in each promissory note of "presentment for payment, protest and notice of protest of nonpayment of this note." The subordination agreements contain a waiver of notice as well.

---

**3.** The corporation invites our attention to certain federal cases involving securities transactions. *See Brunner v. Rounds*, 416 F.Supp. 91 (D.Kan.1975); *Securities & Exchange Commission v. Kelly Andrews & Bradley, Inc.*, 341 F.Supp. 1201 (S.D.N.Y.1972). In these cases, individuals made loans to brokers, and subordinated their claims to repayment to those of the brokers' creditors. The subordination agreements terminated after one year. The courts held that the effect of the termination was prospective only, and that the loans could not be repaid so long as other creditors were asserting claims. However, these cases are inapposite. The subordination agreements in question were all made pursuant to SEC regulations which prohibited the termination of the agreement and repayment of the loan if it would reduce the "net capital" of the broker below a given level. 17 C.F.R. 240.15C3–1. No such regulations are involved in this case.

We do not believe these provisions will bear the weight that Culp and Newton attempt to place on them. The record contains no suggestion that the notes were drafted in contemplation of the subordination agreements or with an eye toward the circumstances eventually attending the termination of those agreements. Rather, the notes' provisions for acceleration and waiver of notice rely for their meaning and validity upon the explicit schedule of annual payments set forth elsewhere in the notes themselves. In this case, Tri-County did not default by failing to make payments on March 1, 1985, as scheduled in the promissory notes. Its performance was suspended at that time. Rather, the alleged default is postulated as a consequence of an independent event: unilateral termination of the subordination agreements by Culp and Newton. As mentioned previously, this unilateral termination occurred, so far as the record shows, without notice to Tri-County and only two days before Tri-County was sued.

In our view, it confounds logic to suggest that a party's failure to perform an obligation, when such performance is precluded, instantly becomes an actionable default upon reinstatement of the obligation by the unilateral act of another party. This situation is analogous to temporary impossibility of performance on a contract. Temporary impossibility merely suspends the duty of performance until the impossibility ceases. J. CALAMARI & J. PERILLO, CONTRACTS § 13–11 (1977). Where the circumstances giving rise to the impossibility cease to exist, a party is entitled to an appropriate extension of time for performance. *See* RESTATEMENT (SECOND) OF CONTRACTS, § 269, comment a.

Equity demands a similar judicial response here.[4] If the subordination agreements and promissory notes, taken together, produced an automatic default upon reinstatement of a suspended obligation, without notice or reasonable opportunity to perform, they would be one-sided, oppressive and, therefore, unconscionable. *See generally, Hershey v. Simpson,* 111 Idaho 491, 725 P.2d 196 (Ct.App.1986) (discussion of substantive unconsionability). Notwithstanding the waivers of notice, we decline to give the documents such an application. We hold that Tri-County was equitably entitled to notice and a reasonable time for performance after the prohibition against paying on the promissory notes was removed by terminating the subordination agreements.

Although the record before us does not indicate that Tri-County received notice, the record is inadequate to resolve that question with finality. Moreover, a reasonable time for performance depends upon the nature of the required act, the parties' situations and the circumstances surrounding the performance. *See generally, e.g., Clevenger v. Potlatch Forests, Inc.,* 85 Idaho 193, 377 P.2d 794 (1963); *Pepper & Tanner, Inc. v. Kedo, Inc.,* 13 Wash.App. 433, 535 P.2d 857 (1975). Such fact-based determinations should be made in the first instance by a trial court.

We conclude that the judgment below must be set aside and the case remanded to the district court. The judge is instructed to ascertain whether Tri-County was notified of the termination, and whether Tri-County then had a reasonable time to make the 1985 interest payment, prior to being sued. If the court determines that Tri-County was not so notified, or that it did not have a reasonable time for performance, then the court should fix a reasonable time for the payment to be made. If the payment is not timely made, a default may

4. We have afforded the parties an opportunity to address this point. After Culp and Newton filed their petition for rehearing, we invited the parties to file supplemental briefs on the following question: "When performance on a contract is suspended for a cause extrinsic to the contract, and the cause subsequently ceases to exist, is the obligor entitled to notice and/or a reasonable time to resume performance before a default is deemed to occur?" The parties responded largely by reiterating their previous positions. Culp and Newton argued that default automatically occurred upon termination; Tri-County argued that termination carried no consequence with respect to the existing bank debt. We have rejected both of these arguments.

be deemed to occur and judgment on the accelerated note may be re-entered.[5]

In sum, our decision recognizes and enforces Tri-County's obligation to make payments on the notes following termination of the subordination agreements. At the same time, it prevents an unconscionable acceleration of the notes. The judgment is vacated and the case is remanded for further proceedings consistent with this opinion. Because all the parties have partially prevailed under today's decision, we award no costs or attorney fees, under contract or statute, on appeal.

WALTERS, C.J., and SWANSTROM, J., concur.

---

**5.** The record does not reveal whether a tender of the 1985 interest was made during the pendency of this litigation. If not, the district court may award interest on the unpaid 1985 installment ("interest on interest") at the promissory note rate from the termination date, April 22, 1985, until payment is made or until a reasonable time for performance has elapsed without payment. In the latter event, interest at the rate provided by I.C. § 28–22–104(1) may be awarded from the date of default until the re-entry of judgment. The district court similarly may fix a payment date and allow interest on any 1986 or 1987 installments that were not paid or tendered, due to uncertainty concerning the enforceability of those obligations, while the instant litigation was pending.