Fremont-Smith, J.
BACKGROUND
Cross-motions for summary judgment on defendants’ counterclaims have been submitted to the Court on an agreed statement of facts, for the Court’s findings, rulings and judgment, which are set forth below.
The dispute arises out of the construction of a co-generation plant in Pepperell, Mass. for the purpose of producing and selling electricity and steam. As part of Energy Management, Inc.’s (“EMI”) sale of a business to plaintiffs,[3] the purchasers agreed that once the plant went into operation, plaintiffs would make quarterly payments to EMI under a Royalty Agreement and a Subordinated Note. Plaintiffs took custody and control of the plant from the general contractor in March 1990 and began to sell electricity and steam soon thereafter. They have, however, refused to make any payments, contending 1) that the substantial completion date has never occurred and 2) that payments are, in any event, prohibited under the provisions of the Subordinated Note, which prohibit payments during any period that the loan from Prudential Insurance Company is in default.
For the reasons stated below, summary judgment is entered for EMI, subject to the limitations indicated below on EMI’s right to receive payment or to levy on the judgment.
FINDINGS OF FACTS
PPA entered into a Royalty Agreement with EMI effective as of June 10, 1988 (the “Royalty Agreement"). Under §2.1 of the Royalty Agreement, PPA agreed to pay EMI $37,500 per quarter for the first fifteen years after the “Commercial Operation Date." Under §2.2, PPA agreed to make minimum royalty payments of $65,000 per quarter thereafter.
Also in June 1988, PPA executed a Subordinated Note (the “Subordinated Note”) in the amount of $5,250,000 evidencing PPA’s obligation to make royalty payments under §§2.1 and 2.2 of the Royalty Agreement for the first twenty-five years of the project. Section 5 of the Subordinated Note provides:
The indebtedness represented in this Note is expressly made subordinate and junior in all respects to the [Prudential] Debt on the basis of Annex D of the [Prudentiall Loan Agreement.
Annex D to the Prudential Loan Agreement, pursuant to which Prudential loaned PPA $41 million for construction, also provides that, if a Note given to Prudential was due, or if there was a default under the Loan Agreement, then no payment would be made by PPA to EMI. However, Annex D, paragraph (c) expressly recognized the right of EMI to bring suit against PPA to recover its indebtedness, as long as EMI agreed not to file any judgment liens or take any other action to levy on the property of PPA.[4]
Paragraph 2.1 of the Royalty Agreement provides that PPA would begin making quarterly royalty payments to EMI “on the first day following the last day of the first full calendar quarter following the Commercial Operation Date.” A similar provision appears in the Subordinated Note.
The “Commercial Operation Date,” as used in Paragraph 2.1 of the Royalty Agreement, is defined in paragraph 1.2 as “the Substantial Completion Date of the Project pursuant to a certain Construction Agreement dated as of February 29, 1988 between PPA and Blount International, Ltd.”
Under Section 6.4 of the Construction Agreement, “Substantial Completion” is defined as follows:
6.4. Substantial Completion. Substantial Completion shall be deemed to have occurred upon .the satisfaction of the following conditions:
6.4.1. performance testing of the Facility shall have been completed in conformance with the Test Procedures and such performance tests shall have satisfied the Guarantees, all in accordance with the procedures set forth in Section 6.1 through 6.3 hereof;
*352 6.4.2. the performance of the Work shall have been completed with the exception of those items specified in a punch list prepared by Contractor and agreed to by Owner, which items shall not cost more than $500,000 in the aggregate to complete and shall be of such a nature that their completion shall not in any way impair the normal daily operation of the Facility after Substantial Completion;
6.4.3. the Facility shall be ready to be occupied and operated for the use for which it was intended;
6.4.4. Contractor shall have delivered to Owner and the Lender’s Engineer all documents required to be delivered to them by Section 3.4;
6.4.5. Contractor shall have delivered to Owner and Lenders’ Engineer a notice signed by the Contractor certifying that all of the preceding conditions in this Section 6.4 have been satisfied; and
6.4.6. Lender’s Engineer shall have delivered to Owner a certificate stating that all of the preceding conditions in Section 6.4 have been satisfied.
Upon the satisfaction of all of the foregoing conditions, Owner shall accept the Facility, subject to Final Completion in accordance with Section 6.5 hereof, by delivering to Contractor notice of such acceptance, and Contractor shall turn over control and operation of the Facility to Owner. The date upon which such acceptance occurs shall be the “Substantial Completion Date.”
By March 1990, the Plant was operational, but tests indicated that the Plant did not satisfy certain performance guarantees under the Construction Contract.
On or about March 23, 1990, PPA entered into a written agreement with Blount (the “Care and Custody Agreement”). The Care and Custody Agreement provides (among other things) that:
a. PPA would take care, custody and control of the Plant from Blount effective March 23, 1990 (¶1);
b. Blount would have an additional 180 days to achieve certain Performance Guarantees identified in the Care and Custody Agreement and Construction Contract and to perform other work (¶2);
c. If Blount were unable to satisfy the Performance Guarantees within 180 days, then Blount would pay PPA liquidated damages, to be deducted to the extent possible from the retainage then being held by PPA (912(a));
d. If Blount concluded that further modification to the Plant would not satisfy the Performance Guarantees, Blount could elect to pay liquidated damages without waiting for expiration of the 180 day period (912(b)); and
e. Upon payment of liquidated damages, Blount “shall be deemed to have satisfied" the Performance Guarantees (12(b)).
(Emphasis supplied.)
In accordance with the Care and Custody Agreement, PPA was operating the Plant no later than March 28, 1990. On that date, PPA began selling electricity generated by the Plant to Commonwealth Electric Company.
On October 23, 1990, Blount notified PPA that the conditions contained in Sections 6.4.1 to 6.4.4 of the Construction Contract had been satisfied, and during 1991, Blount demanded arbitration against PPA for payments of the amount due under the Construction Contract. PPA denied that any sums were owing and sought an affirmative recovery against Blount. The arbitration took place under the Construction Industry Arbitration Rules of the American Arbitration Association. In August 1993, the arbitrators entered an award finding that Blount was entitled to receive the contract balance and retainage, the amount owed pursuant to the substantial completion note, and a heat rate bonus. Since, under the Construction Contract, Blount was not entitled to these payments until Substantial Completion, the award indicates that the arbitrators determined that Blount had substantially completed its contract. They also awarded PPA damages in the nature of a performance adjustment, delay damages, and noise indemnification, suggesting that Blount’s performance, while substantially complete, had not been perfect in every respect.
On June 10, 1991, EMI wrote PPA to inquire why PPA had not yet begun making payments under the Royalty Agreement and Subordinated Note, and, on June 17, 1991, one of the plaintiffs responded by letter that the Plant had not achieved “Substantial Completion” as defined in the Construction Contract so that the royalty payments were not yet due.[5] To date, PPA has made no royalty payments to EMI.
The Construction Note to Prudential matured on November 16, 1990, but $30 million in unpaid principal remains outstanding. The failure to pay the Construction Note upon its maturity constitutes a continuing default under the Loan Agreement, as do various failures by plaintiffs to fulfill conditions of the Loan Agreement (for example, plaintiffs’ failure to make required deposits into the Operating and Maintenance Reserve Account).
RULINGS OF LAW
Even were fulfillment of all of the conditions set forth in Section 6.4 of the Construction Contract considered to have been intended to comprise a condition precedent to Substantial Completion, the non-occurrence of a condition precedent may be excused if (i) the occurrence of a condition was not a material part of the bargain or (ii) non-occurrence of the condition would cause a disproportionate forfeiture. Restatement (Second) of Contracts §29 (1981); See Johnson Controls, Inc. v. Bowes, 381 Mass. 278, 280-81 (1980), Barry v. Frankini, 287 Mass. 196, 199-200 (1934).
In view of the magnitude of the adverse financial consequences to EMI, and the subsequent events which have rendered impossible a literal compliance with each *353 of the preconditions for “Substantial Completion” of the conditions under the Construction Contract, I conclude that literal compliance with each condition should not be deemed to constitute a material part of the bargain between EMI and PPA so as to effect a forfeiture of EMI’s rights in the circumstances here. To hold otherwise would be manifestly unjust where, as here, the plant is operating and PPA has been or is to be paid liquidated damages for the contractor’s failure to fulfill some of the performance guarantees. To permit PPA to receive liquidated damages from Blount (or a reduction in PPA’s payment to Blount) while at the same time excusing PPA from payment of royalties to EMI for the life of a plant, would, in the Court’s judgment, result in a disproportionate forfeiture.
Just as the arbitrators rejected such a harsh result in determining whether Blount has achieved “substantial completion” under the Construction Contract, this Court rejects such a harsh result in its interpretation of the same contractual phrase in the Royalty Agreement.
Accordingly, as PPA was operating the plant in March 1990, and Blount notified PPA that the plant was substantially completed in October 1990, I conclude that payments should have commenced on or about February 1, 1991, but for PPA’s default under its Loan Agreement with Prudential.
PPA has been in default under the Prudential Loan Agreement since November 16, 1990 (when the time for converting the construction loan into a term loan expired). Under the subordination terms incorporated by reference into the Subordinated Note (Annex D to the Loan Agreement), no royalty payments may be made by PPA while the Prudential loan is in default. While such a provision has sometimes been held to constitute a complete bar to any action,[6] here it is clear that, under paragraph (c) of Annex D, although no royalty payments can be made while a default continues, the parties contemplated that EMI could bring a legal action and obtain judgment against PPA under the Royalty Agreement, so long as EMI agreed not to file any judgment lien or take any action to attach or levy on “property of the Borrower.” A cause of action was found not to be barred in similar circumstances in Charles W. and Ruby W. Norton, Inc. v. Leadville Corp., 570 F.2d 911, 912 (10th Cir. 1978); and Wisnouse v. Telsey, 367 F. Supp. 855, 858 (S.D.N.Y. 1973); Minority Equity Capital Co. Inc. v. Jackson, 798 F.Supp. 200, 202-03 (S.D.N.Y. 1992).
JUDGMENT
Accordingly, it is hereby ORDERED that judgment enter for Energy Management, Inc. on its Second Amended Counterclaim against HCE Pepperell, Inc. and KES Pepperell, Inc., general partners of Pepperell Power Associates Limited Partnership, as follows:
(1) Royalty payments from Pepperell Power Associates to Energy Management, Inc. began to accrue no later than February 1, 1991 and continue to accrue as specified in 2.1 and 2.2 of the Royalty Agreement. (2) Judgment shall enter for the plaintiffs against the defendants in said amount, with interest on each payment amount from the due date of each such payment, but no execution shall issue to enforce this judgment against any “property of the Borrower” within the meaning of Annex D to the Prudential Loan Agreement so long as a default under the Loan Agreement continues.

 The plaintiff HCE Pepperell, Inc. is one of two general partners of Pepperell Power Associates Limited Partnership (“PPA”). The terms “PPA” and “the plaintiffs" are sometimes used interchangeably in this decision.

 It provides that EMI “may commence an action to recover subordinated indebtedness as long as it shall agree not to file any judgment liens or take any other action to attach or otherwise levy on any property of the Borrower to satisfy or execute any judgment arising from such action.” EMI has so agreed.

 Insistence on literal compliance with each of the conditions of Section 6.4 of the Construction Agreement, supra, is of course now impossible in view of the subsequent Care and Custody Agreement, which dispensed with some of the conditions.

 See, e.g., Culp v. Tri-County Tractor, Inc., 112 Idaho 894, 898, 736 P.2d 1348, 1352 (1987) (because a subordination agreement barred payments from being made to a junior creditor, the non-payment of the junior debt did not constitute a default for which a cause of action arose); Kurtz v. American Export Industries, Inc., 370 N.Y.S.2d 599, 600 (N.Y.App.Div. 1975).