**Opinion issued July 25, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00195-CV

———————————

**SHAWN IBRAHIM, INC., MAHMOOD AKHTAR AND MUHAMMAD AMIN, Appellants**

**V.**

**HOUSTON- GALVESTON AREA LOCAL DEVELOPMENT CORPORATION AND SUNNYLAND DEVELOPMENT, INC., Appellees**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-40070**

---

## O P I N I O N

Appellees Houston-Galveston Area Local Development Corporation (CDC) and Sunnyland Development, Inc. (Sunnyland) were both involved in financing a construction project undertaken by appellants Shawn Ibrahim, Inc., Mahmood

Akhtar, Ibrahim's president, and Muhammad Amin, another individual associated with Ibrahim (collectively, Ibrahim). Ibrahim sued both CDC and Sunnyland for breach of contract, fraud, and other causes of action, and the trial court granted summary judgment dismissing all of Ibrahim's claims. In two issues on appeal, Ibrahim argues that the trial court erred in granting summary judgment in favor of CDC and Sunnyland. We affirm.

## Background

This case arises out of business relationships among Ibrahim, Sunnyland, and CDC entered into for the purpose of financing a construction project.

### A.     The Project

Starting in 2004, Ibrahim initiated a project to build a truck stop and restaurant complex in La Porte, Texas (the Project).  Sunnyland was the Project developer, and a related company, Suncoast Environmental and Construction, Inc. (Suncoast), was the contractor. The total estimated cost of the Project was $3,711,000.

As a small business, Ibrahim sought to take advantage of special financing available through the U.S. Small Business Association (SBA) pursuant to the Small Business Investment Act, which provides for a special loan program for the financing of fixed assets by small businesses made through local development companies (the 504 Loan Program).  *See* 15 U.S.C. §§ 695–697g.  As part of this

program, the SBA identifies and approves certified development companies to participate in its lending program. *Id.* § 697e. Here, CDC was the certified development company that facilitated Ibrahim's SBA loan.

The SBA agreed to provide $1,012,000 in secured funding for the Project through CDC. Ibrahim obtained private funding through Sterling Bank, which provided a loan for fifty percent of the Project costs and also provided a smaller "interim" loan to allow Ibrahim to complete construction on the Project until the loan through the SBA could close and be used to repay the interim loan. Additionally, Ibrahim itself was required to contribute more than $800,000 to the funding of the Project. Ibrahim needed a "gap" loan of $200,000 to cover its portion of the Project funding, and it obtained this loan from Sunnyland.

The exact nature of the agreements and relationships between the parties is set out in the documents executed with regard to the Project and its funding.

**B.  The Debenture Guarantee**

On July 28, 2005, the SBA executed its "Authorization for Debenture Guarantee (SBA 504 Loan)," guaranteeing, subject to certain conditions, "a 20 year Debenture ('Debenture') in the amount of $1,012,000.00 to be issued by CDC and used to fund a loan ('504 Loan') to assist" Ibrahim in its completion of the Project (Debenture Guarantee). The Debenture Guarantee identified the Project costs as totaling $3,711,000, and it stated that the SBA would provide a loan

3

accounting for 26.45% of the Project costs plus certain administrative costs for a total "Debenture Amount" of $1,012,000.

The Debenture Guarantee also identified several other sources of funding. It stated that Sterling Bank would provide $981,652 in interim financing, to be "paid off by the Debenture" following completion of construction and closing on the 504 Loan through the CDC. It also contemplated that Sterling Bank would provide fifth percent of the Project costs, or $1,855,348, in "permanent project financing," and it placed certain conditions on Sterling Bank's note and loan documents, such as providing that Sterling Bank's loan could not "be cross-collateralized with other financing" and requiring Sterling Bank to execute an agreement confirming that its note and loan documents "do or will comply" with the SBA conditions.

As a condition of authorizing the funds, the SBA required in the Debenture Guarantee that Ibrahim contribute 23.55% of the Project's costs, or approximately $874,000, and it provided that the:

(1) Contribution may be in cash, land or other property acceptable to SBA;

(2) Contribution may come from [Ibrahim's] own resources, CDC, or another source;

(3) If any of the contribution is borrowed and secured by any of the Project Property, the resulting obligation must be expressly subordinate to the liens securing the Promissory Note ("Note") in favor of CDC and may not be repaid at a faster rate than the Note unless prior written approval is obtained from SBA. A copy of any

debt instrument evidencing the obligation must be supplied to CDC at or prior to 504 Loan Closing.

The Debenture Guarantee further provided, "At or prior to the 504 Loan Closing, the Borrower [Ibrahim] must execute a Note in favor of CDC. The CDC must assign the Note to SBA." The Debenture Guarantee also stated, "CDC must execute a satisfactory written assignment to SBA of its interest in the Note, lease and all collateral documents executed by the Borrower and guarantors."

The Debenture Guarantee also anticipated the need for Ibrahim to obtain "gap" or "standby" financing from Sunnyland for a portion of its required contribution to the Project costs, providing:

> At or prior to 504 Closing, CDC [is] to obtain Standby Creditor's Agreement from Sunnyland Development, Inc., for $200,000.00, plus all accrued and future interest (Standby Debt). No payment of principal or interest is to be made on the Standby Debt during the term of the Loan. Standby Creditor [Sunnyland] must subordinate any lien rights in collateral securing the Loan to CDC's right in the collateral, and take no action against Borrower or any collateral securing the Standby Debt without CDC's consent. CDC must attach a copy of the Standby Note evidencing the Standby Debt to the Standby Creditor's Agreement.

In August 2005, both CDC and Ibrahim executed an "Acceptance by Borrower and CDC" agreeing to fully comply with the terms and conditions of the Debenture Guarantee.

## C.    Sunnyland Note

As anticipated by the Debenture Guarantee, Ibrahim borrowed $200,000 from Sunnyland as "standby" financing. Ibrahim executed the promissory note in favor of Sunnyland for the $200,000 "Standby Debt" on December 19, 2005 (Sunnyland Note). The Sunnyland Note was personally guaranteed by Akhtar and Amin.

The Sunnyland Note provided that "[t]he Principal Amount and interest are due and payable in equal monthly installments of TWO THOUSAND NINE HUNDRED THIRTY AND 04/100 DOLLARS ($2,930.04), on the first day of each month, beginning July 1, 2006 and continuing until the unpaid principal and accrued, unpaid interest have been paid in full." The Sunnyland Note was secured by a deed of trust on a portion of the real property involved in the Project.  The Sunnyland Note further provided that "[t]he liens securing this note are subordinate to the 2 liens securing two notes in the original principal amounts of [$1,855,000] and [$982,000], respectively, both being of even date herewith, and executed by Shawn Ibrahim, Inc., payable to the order of Sterling Bank."  The Sunnyland Note further enumerated conditions in which default would occur, including if Ibrahim failed to make a payment, and it provided for acceleration of the amount due and certain late fees and interest in the event of default.

6

Thus, under the terms of the Sunnyland Note, Ibrahim's first payment to Sunnyland was due July 1, 2006. However, Ibrahim failed to make any monthly payments, beginning in July 2006.[1]

## D.     504 Loan Agreement & Standby Creditor's Agreement

Construction of the Project was completed by January 2008, and, on January 24, 2008, the parties moved forward with closing the 504 Loan as contemplated by the Debenture Guarantee.

The "504 Loan Agreement" was entered into between CDC as the lender and Ibrahim as the borrower "in participation with and for the benefit of the [SBA]." The recitals at the beginning of the 504 Loan Agreement stated, in relevant part:

> Borrower [Ibrahim] applied to Lender [CDC] for a $1,128,000 loan (the "Loan") under the SBA 504 Loan Program. Lender has conditionally agreed to extend the Loan to the Borrower. The Loan will be used to finance or refinance a project described in the [Debenture Guarantee]. The Loan will be evidenced by the Note[2] and by the books and records of Lender and the [Central Servicing Agent appointed by Lender and accepted by Borrower in the Servicing Agent Agreement accompanying the closing documents]. The Loan

---

[1]     Instead, Ibrahim made only seven payments on the Sunnyland Note, totaling $57,000, between August 2008 and October 2010.

[2]     The 504 Loan Agreement expressly identified the "Note" as being "SBA Form 1505," executed with the other loan closing documents, and evidencing the Loan in the amount of $1,128,000 executed by Ibrahim, payable to CDC, and "assigned to the SBA."

will be secured by this Agreement and the other Loan Documents.[3] Lender will issue a debenture to fund the Loan. The debenture will be guaranteed by the SBA. The Note and all liens securing the Note will be transferred from Lender to the SBA to secure the SBA's guarantee of Lender's Debenture.

Like the Debenture Guarantee, the 504 Loan Agreement provided that the Note and accompanying liens would be assigned by CDC to the SBA and that, "[a]fter said assignment, the SBA will be entitled to enforce the terms of the Note, this Agreement, and the rest of the Loan Documents." It further provided that CDC "will remain as a servicing agent for the Loan and will serve as such at the pleasure of the SBA."

The 504 Loan Agreement further provided for the disbursement of loan proceeds, stating that the main portion of the loan would be disbursed to Sterling Bank to refinance the interim funding, and the remainder would be disbursed to cover the enumerated administrative costs. The 504 Loan Agreement provided for repayment of the loan over the next twenty years in monthly installments.

The 504 Loan Agreement also identified conditions that would constitute a default, including that "[a] default will have occurred if Borrower [Ibrahim] does not make a payment when due under the Note [securing the 504 Loan]," if Ibrahim

---

[3] The 504 Loan Agreement defined "Loan Documents" as "the documents, as modified, that are now or hereafter executed in connection with or as security for the Note, including without limitation, this Agreement and any servicing agent agreements, guarantees, deeds of trust, security agreements, certifications, and affidavits."

8

"[d]oes not disclose . . . any material fact to Lender [CDC] or SBA," or if Ibrahim "[b]ecomes the subject of a civil or criminal action that Lender believes may materially affect Borrower's ability to pay the [504] Note." The 504 Loan Agreement expressly referenced the Debenture Guarantee, stating, "It is the intention of the Borrower and Lender that this Agreement mirror the terms contained in the [Debenture Guarantee]. In the event of a conflict between the terms of this Agreement and the [Debenture Guarantee], the [Debenture Guarantee] will control."

At the same time that the 504 Loan Agreement was executed, CDC and Sunnyland likewise executed the Standby Creditor's Agreement required by the Debenture Guarantee for the 504 Loan to close. The Standby Creditor's Agreement was signed by Ajaz Siddiqui, as the president of Sunnyland, and James Walsh as the CDC loan officer. Neither Ibrahim nor Akhtar or Amin personally was a party to this Agreement.

The Standby Creditor's Agreement expressly referenced the 504 Loan made to Ibrahim, and it cited the "authorization" for the loan: "the Authorization for Debenture Guarant[ee], as amended, issued by the SBA in connection with the" 504 Loan made through CDC. The Standby Creditor's Agreement identified Shawn Ibrahim, Inc., as the "borrower" and "Standby Debtor"; it identified Sunnyland as the "Standby Creditor"; and it recognized CDC as the lender and

9

certified development company authorized by the SBA. The Standby Creditor's Agreement also identified the "Standby Debt" as being the "$200,000 promissory note attached (Sunnyland Note)." It further provided:

> To induce CDC to make the CDC Loan to Borrower, and in consideration of the making by CDC of the CDC Loan, Standby Creditor hereby represents, warrants and covenants to and with CDC, its successors and assigns, as follows:
>
> 1. There is owing by Standby Debtor to Standby Creditor the amount of the Standby Debt.
>
> 2. Standby Creditor agrees:
>
> > a. To accept no further payments on the Standby Debt except as permitted in the [Debenture Guarantee].
> >
> > b. To turn over to CDC, within 15 days of receipt, payments received by Standby Creditor from Standby Debtor in violation of this Agreement.
> >
> > c. To take no action to enforce claims against Standby Debtor on the Standby Debt, without written consent from CDC, until the CDC Loan is satisfied.
> >
> > d. To take no action against Standby Debtor's collateral, without written consent from CDC, until the CDC Loan is satisfied.
> >
> > e. That all liens and security interests securing the Standby Debt are secondary and inferior to all liens and security interests securing the CDC Loan.
> >
> > f. To sign any other documentation required by CDC to subordinate the liens and security interests securing the Standby Debt to the liens and security interests securing the CDC Loan.

3. CDC, in its sole discretion, may take any action without affecting this Agreement, including but not limited to the following:

   a. Modify the terms of the CDC Loan.

   b. Grant an extension or renewal of the CDC Loan.

   c. Defer payments or enter into a workout agreement on the CDC Loan.

   d. Release or substitute collateral securing the CDC Loan.

   e. Forbear from collecting on existing collateral or requiring additional collateral.

   f. Declare a default on the CDC Loan and notify Standby Creditor to stop accepting payments.

   g. Agree to release, compromise, or settlement of the CDC Loan.

4. This Agreement applies to any successor to the Standby Creditor or assignee of the Agreement or of the Standby Debt, including any bankruptcy trustee or receiver or guarantors or sureties of the Standby Debt.

5. Additional Loans made by Standby Creditor to Standby Debtor will be subject to the terms of this Agreement, unless CDC agrees otherwise in writing.

According to the declaration of Jack Steele, the executive director of CDC, following the execution of the 504 Loan Agreement between CDC and Ibrahim, CDC "assigned all of its rights in the Loan Documents to the SBA but remain[ed] a 'servicing agent' for the SBA." However, CDC did not provide any documents effectuating the assignment of its interest in the 504 Loan to the SBA.

11

### E.    Sunnyland Note Suit

Several years after the 504 Loan closed in 2008, presumably while Ibrahim was still making payments on the 504 Loan, Ibrahim became dissatisfied with the work Sunnyland and Suncoast had completed on the Project.

On January 14, 2011, Ibrahim filed suit in the 61st District Court of Harris County against Sunnyland, Suncoast, and the principals of those companies for breach of the construction contract and construction defects, among other claims. Sunnyland counterclaimed against Ibrahim for the amounts due on the Sunnyland Note, eventually joining Akhtar and Amin as parties in their capacities as guarantors on that Note (the Sunnyland Note Suit). Ibrahim settled its claims against Sunnyland and Suncoast, and Sunnyland's counterclaim for the amounts due on the Sunnyland Note went to a bench trial.

The trial court in the Sunnyland Note Suit found in favor of Sunnyland and ordered Ibrahim, Akhtar, and Amin, jointly and severally, to pay $453,667.59 as the amount then due under the Sunnyland Note and $63,591.79 as reasonable and necessary attorney's fees.

A panel of this Court affirmed the judgment of the trial court. *See Shawn Ibrahim, Inc. v. Suncoast Envtl. & Constr., Inc.*, No. 01-14-00583-CV, 2015 WL 4043242, at *1 (Tex. App.—Houston [1st Dist.] July 2, 2015, pet. denied) (mem. op.). In that opinion, this Court characterized the Sunnyland Note Suit as "a suit to

12

collect on an unpaid promissory note." *Id.* at *1. One of the issues raised by Ibrahim, Akhtar, and Amin in that appeal was whether the trial court "misinterpreted a standby creditor's agreement that [Ibrahim alleged would] preclude[] judicial enforcement of the [Sunnyland Note], thus barring a judgment against [Ibrahim and the guarantors Akhtar and Amin]." *Id.* In analyzing the effect of the Standby Creditor's Agreement on the enforcement of the Sunnyland Note, this Court recounted Ibrahim's contention that "Sunnyland did not meet the conditions precedent required by the standby creditor's agreement before it sued, which in turn bars it from enforcing the note" and that "Sunnyland had the burden to show conditions precedent[, i.e.,] that the [504 Loan] was satisfied and that the [CDC had given] its written consent for Sunnyland to enforce the note." *Id.* at *3. Sunnyland argued, however, that Ibrahim failed to plead as an affirmative defense that the Standby Creditor's Agreement precluded enforcement of the Sunnyland Note. *Id.* at *4.

This Court held that the parties had tried the issue of Ibrahim's affirmative defense under the Standby Creditor's Agreement by consent, observing that "[t]he standby creditor agreement was introduced at trial and discussed multiple times during witness testimony, without an objection from Sunnyland." *Id.* In considering the merits of Ibrahim's claim, this Court held, "Although Ibrahim proffered evidence of the standby agreement, it did not provide evidence about

whether the [504 Loan Agreement] had been breached or whether [the CDC] had consented to Sunnyland's suit." *Id.* This Court further held that, because Ibrahim provided only a partial reporter's record and did not raise the issue of whether Sunnyland breached the Standby Creditor's Agreement with the CDC in its statement of issues on appeal, the Court was required to "presume that the trial court heard evidence to support its judgment that the standby agreement does not bar a recovery on the note due to any failure to comply with a condition precedent." *Id.*; *see also* TEX. R. APP. P. 34.6 (governing filing of partial reporter's record and providing that partial record will be considered sufficient to review issues identified in statement of points or issues to be presented on appeal that is included in request for partial record); *Bennett v. Cochran*, 96 S.W.3d 227, 229–30 (Tex. 2002) (holding that without statement of points of issues, courts presume that omitted portions of record support trial court's findings). This Court ultimately affirmed the trial court's judgment in the Sunnyland Note Suit in favor of Sunnyland. *Shawn Ibrahim, Inc.*, 2015 WL 4043242, at *6.

CDC did not participate in the Sunnyland Note Suit in any way, and the record indicates that it did not receive notice of those proceedings until, at the earliest, September 2014. Akhtar filed a declaration stating that he contacted CDC in September 2014, about six months after the final judgment in the Sunnyland Note Suit, while the case was pending in this Court on appeal. He stated that he

14

informed a woman named Brenda Edwards that Sunnyland had violated the terms of the loan documents, including the Standby Creditor's Agreement, by seeking payment on the Sunnyland Note. CDC disputes that it received this notice and contends that Ibrahim never sought its involvement in the Sunnyland Note Suit proceedings.

## F.     Present Suit against CDC and Sunnyland

Ibrahim filed the present lawsuit on June 12, 2016. In its petition, Ibrahim set out facts establishing the contractual relationships discussed above.

Ibrahim argued in its petition that the Debenture Guarantee "identified the Sunnyland Note" and expressly prohibited any payment of principal or interest on the Sunnyland Note during the term of the 504 Loan. The pleadings also asserted,

> It was the clear intention of the SBA and CDC to prevent Sunnyland from requiring, collecting, or receiving payments on the Sunnyland Note before the 504 Loan was satisfied. As was intended, Ibrahim relied on the Authorization [i.e., Debenture Guarantee] and the Standby Creditor's Agreement, and did not make regular or timely payments on the Sunnyland Note.

Ibrahim argues that Sunnyland violated the Standby Creditor's Agreement when it sued to collect on the Sunnyland Note and obtained the resulting judgment, affirmed by this Court, for payments due under the Sunnyland Note and attorney's fees—$547,259.38 plus interest. Ibrahim further alleged that Sunnyland "continues to take action" to enforce its claim on the Sunnyland Note in violation of the Standby Creditor's Agreement and that "[t]he CDC was notified and, with actual

15

notice and knowledge of Sunnyland's violations, is failing to take action to enforce the Standby Creditor's Agreement against Sunnyland."

Based on these facts and allegations, Ibrahim alleged causes of action against CDC and Sunnyland for breach of contract, promissory estoppel, fraud, and negligent misrepresentation. Ibrahim sought damages consisting of the amount due under the final judgment in the Sunnyland Note Suit plus the attorney's fees and other expenses that it incurred in litigating the Sunnyland Note Suit.

On September 9, 2017, CDC filed its motion for summary judgment.[4] CDC asserted multiple traditional and no-evidence grounds for summary judgment dismissing all of Ibrahim's claims against it. Primarily, CDC asserted that none of the Loan Documents created a duty to Ibrahim to enforce the Standby Creditor's Agreement against Sunnyland, nor could the Loan Documents be construed as a representation that CDC would so enforce the Standby Creditor Agreement. CDC also moved for summary judgment on various affirmative defenses such as waiver and prior material breach. CDC further asserted that Ibrahim had no evidence of

---

[4] This was actually CDC's second motion for summary judgment. CDC had previously filed a combined plea to the jurisdiction and motion for summary judgment, asserting an immunity defense and other grounds for dismissal of Ibrahim's claims. The trial court denied the plea to the jurisdiction on immunity grounds, but did not provide a ruling on the remainder of the grounds raised in CDC's first motion. CDC re-urged the grounds from its first motion, but the trial court ultimately only ruled on the second motion for summary judgment, so that is the motion that we review on appeal.

one or more essential elements on its breach of contract, promissory estoppel/detrimental reliance, fraud, and negligent misrepresentation claims.

CDC argued that the Loan Documents created a subordination agreement by which Sunnyland agreed to defer its collection of the Sunnyland Note, but they did not create any duty on the part of the SBA or CDC to enforce the Loan Documents against Sunnyland to protect Ibrahim from having to pay the Sunnyland Note. CDC also asserted res judicata, despite the fact that it was not a party to the prior Sunnyland Note Suit, based on the fact that in the first suit Ibrahim unsuccessfully raised the issue of the effect of the Standby Creditor Agreement on its obligation to pay the Sunnyland Note. As summary judgment evidence, CDC provided the Loan Documents discussed above, certified copies of the court filings from the Sunnyland Note Suit, and declarations of CDC's executive director and its attorney.

Sunnyland likewise moved for summary judgment dismissing Ibrahim's claims against it based on res judicata, claiming that the judgment in the Sunnyland Note Suit precluded Ibrahim from raising its breach of contract and other claims in the present suit.

On February 12, 2018, the trial court granted CDC's and Sunnyland's motions for summary judgment and dismissed all of Ibrahim's claims against both parties. This appeal followed.

17

## Sunnyland's Summary Judgment

In its second issue on appeal, Ibrahim argues that the trial court erred in granting summary judgment in favor of Sunnyland because Sunnyland failed to establish as a matter of law that all of Ibrahim's claims against it are barred by res judicata.

### A.     Standard of Review

We review a trial court's ruling on a summary judgment motion de novo. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 258 (Tex. 2018). To prevail on a traditional summary judgment motion, the movant bears the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *City of Richardson*, 539 S.W.3d at 258–59. When a defendant moves for traditional summary judgment, it must either: (1) disprove at least one essential element of the plaintiff's cause of action, or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating the plaintiff's cause of action. *Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 704 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995) (per curiam); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995)).

If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact. *See Katy Venture, Ltd. v. Cremona Bistro*

*Corp.*, 469 S.W.3d 160, 163 (Tex. 2015) (per curiam); *see also First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (stating that fact question exists if evidence rises to level that would enable reasonable and fair-minded people to differ in their conclusions). We review the evidence presented in the motion and response in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Helix Energy Sols. Grp., Inc. v. Gold*, 522 S.W.3d 427, 431 (Tex. 2017).

**B.     Law of Res Judicata**

Res judicata is an affirmative defense that bars the re-litigation of certain claims or cases between parties which have already been decided. *See Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010); *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 266 (Tex. App.—Houston [1st Dist.] 2018, pet. dism'd). The burden is on the party asserting an affirmative defense to plead and prove the defense's respective elements. *See Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 137 (Tex. App.—El Paso 1997, pet. denied).

To successfully assert the affirmative defense of res judicata, a party must prove: (1) a final prior judgment on the merits by a court of competent jurisdiction; (2) the identity of the parties, or those in privity with them; and (3) a second action based on the same claims as were or could have been raised in the first action. *Joachim*, 315 S.W.3d at 862; *Eagle Oil & Gas Co.*, 549 S.W.3d at 266. "When applicable, res judicata bars the second, subsequent suit." *Eagle Oil & Gas Co.*, 549 S.W.3d at 266 (citing *Joachim*, 315 S.W.3d at 862); *see also Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 750 (Tex. 2017) ("Res judicata bars the relitigation of claims that have been finally adjudicated or that could have been litigated in the prior action.") (quoting *Igal v. Brightstar Info. Tech. Grp., Inc.*, 250 S.W.3d 78, 86 (Tex. 2008)); *Tex. Water Rights Comm'n v. Crow Iron Works*, 582 S.W.2d 768, 771–72 (Tex. 1979) (holding that party may not pursue claim determined by final judgment of court of competent jurisdiction in prior suit as ground of recovery in later suit against same parties).

"When, as here, the material facts are not disputed, the applicability of res judicata presents a question of law, which we review de novo." *Eagle Oil & Gas Co.*, 549 S.W.3d at 267.

## C.  Analysis

In the prior Sunnyland Note Suit, the trial court ordered Ibrahim to pay damages to Sunnyland. In the present suit, Ibrahim sued Sunnyland seeking to

recover those damages plus the costs and attorney's fees Ibrahim incurred in defendant the Sunnyland Note Suit. Ibrahim pleaded causes of action for breach of contract, fraud, negligent misrepresentation, and promissory estoppel against Sunnyland, alleging that it breached the Standby Creditor's Agreement and other provisions in the Loan Documents providing that Sunnyland was required to subordinate its interest in the Sunnyland Note to CDC's interest in the 504 Loan. Specifically, Ibrahim relies on (1) the provision from the Debenture Guarantee stating that "No payment of principal or interest is to be made on the Standby Debt [i.e., the Sunnyland Note] during the term of the [504] Loan" and (2) the provision of the Standby Creditor's Agreement between CDC and Sunnyland in which Sunnyland agreed "[t]o accept no further payments on the Standby Debt except as permitted in the [Debenture Guarantee]."

Sunnyland moved for summary judgment on the ground that res judicata barred these claims. Sunnyland asserted that this issue—i.e. the effect of the Standby Creditor's Agreement on Ibrahim's obligation to pay under the Sunnyland Note—was litigated in the Sunnyland Note Suit between itself and Ibrahim. The trial court in the Sunnyland Note Suit was a court of competent jurisdiction that rendered a final judgment rejecting Ibrahim's defense under the Standby Creditor's Agreement, and that judgment was affirmed by this Court. *See Shawn Ibrahim, Inc.*, 2015 WL 4043242, at *1, *4. As summary judgment evidence, Sunnyland

provided certified copies of the pleadings, findings of fact and conclusions of law, and the final judgment of the trial court in the Sunnyland Note Suit. The trial court granted Sunnyland's motion for summary judgment.

Reviewing Sunnyland's summary judgment evidence, we conclude that it established the elements of res judicata. The trial court in the prior Sunnyland Note Suit rendered a final judgment on the merits of Sunnyland's claim for enforcement of the Sunnyland Note and the defenses raised by Ibrahim, including its defense that the terms of the Standby Creditor's Agreement prevented Sunnyland from enforcing the Sunnyland Note against Ibrahim. That judgment was affirmed by this Court. Ibrahim, Akhtar, Amin, and Sunnyland were all parties to the Sunnyland Note Suit. And the claims raised in this second action are based on the same rights and obligations of the parties and were raised in the Sunnyland Note Suit. *See id.*; *see also Joachim*, 315 S.W.3d at 862 (reciting elements of res judicata); *Eagle Oil & Gas Co.*, 549 S.W.3d at 266 (same). Thus, the burden shifted to Ibrahim to raise a fact issue on at least one element of Sunnyland's affirmative defense. *See Katy Venture, Ltd.*, 469 S.W.3d at 163.

As Ibrahim acknowledges in its brief on appeal, there is no dispute that the Sunnyland Note Suit was a final determination on the merits by a court of competent jurisdiction or that the Sunnyland Note Suit involved the same parties as the present case. Rather, Ibrahim argues that "Sunnyland fails to establish the third

22

element [requiring that the second action be based on the same claims as were or could have been raised in the first action] because the claims in this lawsuit are not the same claims that the first action was based on, nor are they claims that were required to have been raised in that lawsuit." Ibrahim acknowledges that, in the Sunnyland Note Suit, it "argued that the Standby Creditor's Agreement barred Sunnyland from enforcing the [Sunnyland Note]." Ibrahim argues, however, that this present suit presents a different claim. It now asserts that Sunnyland breached the Standby Creditor's Agreement by pursuing collection on the Sunnyland Note without CDC's consent and that Sunnyland committed fraud or made a negligent misrepresentation that its Note would be subordinate to the 504 Loan and that it would not take action to collect on the Sunnyland Note before the 504 Loan was paid.

Ibrahim further argues that its claims in the present suit "are substantively distinct from Sunnyland's claim in the first lawsuit, and they arise from a different transaction." It argues that the Sunnyland Note Suit "concerned performance of the $200,000 note between Ibrahim and Sunnyland that was signed in December 2005" and that Ibrahim raised the Standby Creditor's Agreement "only as a defense to its alleged obligations under the Sunnyland Note." It contends that this present case, by contrast, "concerns the formation and performance of that Standby Creditor's Agreement, signed in January 2008, and specifically whether, in

23

entering that agreement, Sunnyland made promises on which Ibrahim justifiably relied but which Sunnyland did not keep." These distinctions, however, are not borne out by the record.

The question of whether Sunnyland breached the Standby Creditor's Agreement or committed fraud or some other tort in attempting to enforce the Sunnyland Note is not a separate legal question from the ultimate enforceability of the Sunnyland Note. Rather, the existence and terms of the Standby Creditor's Agreement constituted an affirmative defense to Sunnyland's collection and enforcement attempt in the Sunnyland Note Suit. *See e.g.*, *Tamsco, Inc. v. Janus*, 553 S.W.2d 244, 246 (Tex. App.—Waco 1977, writ ref'd n.r.e.) (holding that if subordination agreement was to be used as defense to suit to enforce subordinate note, then debtor bears burden to come forward with proof that senior creditor would treat collection of subordinate note as breach of subordination agreement); *Montesino v. Arguello*, 433 So.2d 383, 386 (La. Ct. App. 1983) (holding that "the provisions of the Standby Agreement provide that the obligation to [the standby creditor] shall be payable when the SBA loan has been paid" and that "those written documents have modified the terms of the [standby creditor's] promissory note"; concluding that "the terms of the note were modified by the Standby Agreement" and thus, "nothing was owed on the note when suit was filed [and] the note [was] not due until after payment . . . of the SBA loan"); *Culp v. Tri-Cty.*

24

*Tractor, Inc.*, 736 P.2d 1348, 1351–52 (Idaho Ct. App. 1987) (recognizing that subordination agreements "were intended to protect the bank," but nevertheless holding, "[T]he fact remains that such protection [afforded by the subordination clause providing that debtor 'make no payment to' the subordinate creditors until its obligation to the bank had been satisfied or until the bank consented] was created by altering the rights and duties embodied in the promissory notes" and that debtor "was entitled to invoke these agreements as a defense to claims that it defaulted by failing to pay" under terms of subordinate promissory note).

Ibrahim's claim that the Standby Creditor's Agreement obligated Sunnyland to forebear on collecting on the Sunnyland Note should have been—and in fact was—raised in the prior Sunnyland Note Suit. *See Shawn Ibrahim, Inc.*, 2015 WL 4043242, at *3–4 (concluding that defense to enforcement created by Standby Creditor's Agreement was tried by consent in trial court and that Ibrahim failed to prove its entitlement to that defense). Ibrahim cannot now recategorize these same arguments as breach of contract or tort claims in an attempt to get Sunnyland to pay to Ibrahim as damages in the present suit the very judgment that the trial court awarded to Sunnyland in the first suit. *See Engelman Irrigation Dist.*, 514 S.W.3d at 750 ("Res judicata bars the relitigation of claims that have been finally adjudicated or that could have been litigated in the prior action."); *Tex. Water Rights Comm'n*, 582 S.W.2d at 771–72 (holding that party may not pursue claim

25

determined by final judgment of court of competent jurisdiction in prior suit as ground of recovery in later suit against same parties).

We overrule Ibrahim's second issue.

## CDC's Summary Judgment

In its first issue on appeal, Ibrahim argues that the trial court erred in granting CDC's motion for summary judgment and dismissing all of Ibrahim's claims against CDC.

### A. Standard of Review

CDC moved for traditional summary judgment on multiple grounds, which we review under the standard set out above in our discussion of Ibrahim's claims against Sunnyland. CDC also moved for summary judgment on no-evidence grounds. After an adequate time for discovery, the party without the burden of proof may move for a no-evidence summary judgment on the basis that there is no evidence to support an essential element of the nonmovant's claim. TEX. R. CIV. P. 166a(i); *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). The trial court must grant the no-evidence summary judgment unless the nonmovant produces competent summary judgment evidence raising a genuine issue of material fact on the challenged elements. TEX. R. CIV. P. 166a(i); *Hamilton*, 249 S.W.3d at 426. We apply the legal-sufficiency standard of review to no-evidence summary judgment motions. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572,

581–82 (Tex. 2006); *City of Keller*, 168 S.W.3d at 823, 827. Applying that standard, a no-evidence point will be sustained when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

To defeat a no-evidence motion, the nonmovant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements. *Lightning Oil Co. v. Anadarko E & P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). "More than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 376 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). A nonmoving party is not required to marshal all of its proof, but it must present countervailing evidence that raises a genuine fact issue on the challenged elements. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing TEX. R. CIV. P. 166a). We consider the evidence in the light most favorable to the nonmovant and indulge every

reasonable inference from the evidence in the nonmovant's favor. *Lightning Oil*, 520 S.W.3d at 45.

When, as here, the summary judgment order does not specify the grounds on which it was granted, the appealing party must demonstrate that none of the proposed grounds are sufficient to support the judgment. *West v. SMG*, 318 S.W.3d 430, 437 (Tex. App.—Houston [1st Dist.] 2010, no pet.). We will affirm a summary judgment ruling if any of the grounds asserted in the motion are meritorious. *Lightning Oil*, 520 S.W.3d at 45.

## B.     Breach of Contract

In its first issue on appeal, Ibrahim argues, in relevant part, that the trial court erred in granting CDC's motion for summary judgment because CDC failed to establish as a matter of law that it did not make any express or implied promises to Ibrahim. CDC acknowledges the existence of the contracts in this case, but argues that nothing in the Loan Documents constituted a contract or other promise or representation to Ibrahim obligating CDC to enforce its right to subordinate the Sunnyland Note to the 504 Loan. We agree with CDC.

### 1.     *Law Governing Breach of Contract Claim*

To prevail on its breach of contract claim against CDC, Ibrahim was required to establish (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant;

and (4) damages sustained as a result of the breach. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). To maintain a breach of contract action, a plaintiff must show privity of contract or that it is a third-party beneficiary under the contract. *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 738 (Tex. App.—Dallas 2007, pet. denied). A person seeking to establish third-party beneficiary status must demonstrate that the contracting parties "intended to secure a benefit to that third party" and "entered into the contract directly for the third party's benefit." *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) (quoting *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002) (per curiam)); *City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011) (stating that third parties have standing to recover under contracts that are clearly intended for their direct benefit and that contract need not have been executed solely to benefit third party).

Contract language that can be given a certain or definite meaning is not ambiguous, and in that situation we construe the contract as a matter of law. *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009) (per curiam). In construing a written contract, our primary concern is to ascertain the true intention of the parties as expressed in the plain language of the contract. *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016) (per curiam); *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d

296, 305 (Tex. 2015). "We 'construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served,' and avoiding unreasonable constructions when possible and proper." *Plains Expl. & Prod.*, 473 S.W.3d at 305 (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). We consider the entire writing, harmonizing and giving effect to all of the contract provisions so that none of them will be rendered meaningless. *Id.*; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *see also Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 7 (Tex. 2014) ("When parties disagree over the meaning of an unambiguous contract, we determine the parties' intent by examining the entire agreement."). "No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole." *Plains Expl. & Prod.*, 473 S.W.3d at 305.

The Texas Supreme Court has held that "well-established law" provides that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, "even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000).

### 2. *Construction of the Loan Documents*

In seeking recovery of the sums it was ordered to pay and the attorney's fees it incurred in the Sunnyland Note Suit, Ibrahim argues that CDC breached the

Debenture Guarantee and the Standby Creditor's Agreement by failing to enforce the terms of those agreements and thereby prevent Sunnyland from collecting or attempting to collect on the Sunnyland Note.

As Ibrahim correctly argues, the Debenture Guarantee—executed by the SBA on July 28, 2005, and approved by Ibrahim and CDC in August 2005—contemplated that Ibrahim would obtain standby funding of $200,000 from Sunnyland and that this standby loan would be subordinate to the 504 Loan once it closed. Specifically, the Debenture Guarantee contemplated that Ibrahim would borrow a portion of its financial contribution to the Project costs from a third-party lender and stated:

> If any of the contribution is borrowed and secured by any of the Project Property, the resulting obligation must be expressly subordinate to the liens securing the Promissory Note ("Note") in favor of CDC and may not be repaid at a faster rate than the Note unless prior written approval is obtained from SBA.

The Debenture Guarantee further contemplated the specific details of Ibrahim's standby funding from Sunnyland, providing:

> At or prior to 504 Closing, CDC [is] to obtain [a] Standby Creditor's Agreement from Sunnyland Development, Inc., for $200,000.00, plus all accrued and future interest (Standby Debt). No payment of principal or interest is to be made on the Standby Debt during the term of the Loan. Standby Creditor must subordinate any lien rights in collateral securing the Loan to CDC's right in the collateral, and take no action against Borrower or any collateral securing the Standby Debt without CDC's consent. CDC must attach a copy of the Standby Note evidencing the Standby Debt to the Standby Creditor's Agreement.

31

Subsequently, at the closing for the 504 Loan that occurred in January 2008, CDC fulfilled its obligation under the Debenture Guarantee to provide an executed Standby Creditor's Agreement. The Standby Creditor's Agreement, executed between CDC and Sunnyland on January 24, 2008, expressly referenced the 504 Loan made to Ibrahim, and it cited the requirements of the Debenture Guarantee. The Standby Creditor's Agreement identified Shawn Ibrahim, Inc., as the "borrower" and "Standby Debtor"; it identified Sunnyland as the "Standby Creditor"; and it recognized CDC as the lender and certified development company authorized by the SBA. It provided:

> To induce CDC to make the CDC Loan to Borrower [Ibrahim], and in consideration of the making by CDC of the CDC Loan, Standby Creditor [Sunnyland] hereby represents, warrants and covenants to and with CDC, its successors and assigns, as follows:
>
> 1. There is owing by Standby Debtor to Standby Creditor the amount of the Standby Debt [$200,000].
>
> 2. Standby Creditor agrees:
>
>> a. To accept no further payments on the Standby Debt except as permitted in the [Debenture Guarantee].
>>
>> b. To turn over to CDC, within 15 days of receipt, payments received by Standby Creditor from Standby Debtor in violation of this Agreement.
>>
>> c. To take no action to enforce claims against Standby Debtor on the Standby Debt, without written consent from CDC, until the CDC Loan is satisfied.
>>
>> . . . .

32

Ibrahim argues that these provisions create at least a fact question as to whether CDC owed Ibrahim a duty to enforce the Standby Creditor's Agreement and, thus, to prevent Sunnyland from enforcing or collecting on the Sunnyland Note. However, we observe that resolution of this question involves the construction of these unambiguous contracts and, therefore, is not a question of fact but a legal question that we determine as a matter of law. *See Chrysler Ins. Co.*, 297 S.W.3d at 252 (holding that contract language that can be given certain or definite meaning is not ambiguous and is construed as a matter of law).

Under their plain language, these provisions of the Debenture Guarantee and the Standby Creditor's Agreement act to subordinate the Sunnyland Note to the 504 Loan. *See Montesino*, 433 So.2d at 386; *Culp*, 736 P.2d at 1351–52. These provisions required that Sunnyland agree to forbear collecting on or enforcing the Sunnyland Note in favor of the 504 Loan, and it vested CDC[5] with the right to enforce the terms of the Standby Creditor's Agreement. The Standby Creditor's Agreement further provided that CDC could consent to Sunnyland taking action to collect on the Sunnyland Note. And it provided that CDC was entitled to have

---

[5]    CDC argues that the rights under the 504 Loan were assigned to the SBA, and that the right to enforce the terms of the Standby Creditor's Agreement and other Loan Documents now rests with the SBA. CDC cites to the declaration of its executive director indicating that the 504 Loan was assigned to the SBA following closing. Ibrahim argues that this is no evidence that the 504 Loan was actually assigned, and we note that the SBA is not a party to this lawsuit, which asks us to determine CDC's obligations to Ibrahim under the Loan Documents. Thus, we do not address what obligations, if any, fall to the SBA.

Sunnyland transfer to CDC, "within 15 days of receipt, payments received by [Sunnyland] from [Ibrahim] in violation of this Agreement."

These terms were thus developed to allow CDC to protect its investment through the 504 Loan—nothing in the terms of either the Debenture Guarantee or the Standby Creditor's Agreement indicated that these terms were to benefit Ibrahim. *See, e.g.*, *Tamsco, Inc.*, 553 S.W.2d at 246 (holding that subordination agreement is "for the sole benefit" of senior creditor); *Culp*, 736 P.2d at 1351 (recognizing that purpose of subordination agreements was "to protect the bank," the senior creditor in that case). While Ibrahim was entitled to invoke this provision as a defense to Sunnyland's attempt to enforce the Sunnyland Note—and Ibrahim did in fact make that argument in the Sunnyland Note Suit, albeit unsuccessfully—it does not follow that the Standby Creditor's Agreement vested CDC with an obligation to raise that defense on Ibrahim's behalf or otherwise defend and indemnify Ibrahim in a suit between Ibrahim and Sunnyland.

We conclude that the Debenture Guarnatee and Standby Creditor's Agreement gave CDC the right to prevent Sunnyland from enforcing and collecting on the Sunnyland Note, but these documents did not create an *obligation* for CDC to do so for Ibrahim's benefit. In fact, the Standby Creditor's Agreement expressly states that CDC can consent to Sunnyland's collection efforts.

34

We also observe that Ibrahim was not a party to the Standby Creditor's Agreement—it was executed between Sunnyland and CDC. To the extent that Ibrahim argues it is a third-party beneficiary of this Agreement, we disagree. *See OAIC Commercial Assets, L.L.C.*, 234 S.W.3d at 738 (holding that plaintiff must show privity of contract or status as third-party beneficiary under contract to maintain breach of contract action). There is no evidence, either in the Loan Documents themselves or in any other summary judgment evidence, that the contracting parties here "intended to secure a benefit to" Ibrahim in subordinating the Sunnyland Note to the 504 Loan, or that they entered into the Standby Creditor's Agreement "directly for [Ibrahim's] benefit." *See Brumitt*, 519 S.W.3d at 102. To the contrary, the Standby Creditor's Agreement was intended to benefit CDC, and through it the SBA, by protecting its investment in making the 504 Loan. The 504 Loan itself was intended, in part, to benefit Ibrahim, but the subordination agreements between the creditors were for the benefit of CDC. *See Williams*, 353 S.W.3d at 145 (stating that third parties have standing to recover under contracts that are clearly intended for their direct benefit and that contract need not have been executed solely to benefit third party); *Tamsco, Inc.*, 553 S.W.2d at 246 (holding that subordination agreement is "for the sole benefit" of senior creditor).

Ibrahim argues that, even if the express terms of the contract do not require CDC to enforce the Standby Creditor's Agreement, "as a necessary extension of CDC's express promise to obtain Sunnyland's agreement to take no action against Ibrahim on the [Sunnyland Note], CDC made an implied promise to enforce that agreement." We disagree.

In construing a written contract, our primary concern is to ascertain the true intention of the parties *as expressed in the contract*. *N. Shore Energy*, 501 S.W.3d at 602; *Plains Expl. & Prod. Co.*, 473 S.W.3d at 305. "Generally, a court looks only to the written agreement to determine the obligations of contracting parties." *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 747 (Tex. 2003). To imply a term into an agreement, it must appear that it is necessary to do so in order to effectuate the purposes of the contract as a whole as gathered from the written instrument. *See Fielding*, 289 S.W.3d at 850; *HECI Expl. Co.*, 982 S.W.2d at 888; *WesternGeco, L.L.C. v. Input/Output, Inc.*, 246 S.W.3d 776, 783 (Tex. App.—Houston [14th Dist.] 2008, no pet.). "[I]mplied covenants are not favored by law and will not be read into contracts except as legally necessary to effectuate the plain, clear, unmistakable intent of the parties." *In re Bass*, 113 S.W.3d 735, 743 (Tex. 2003) (orig. proceeding).

Considering the Loan Documents as a whole, nothing in the documents indicates that some implied term is necessary to effectuate the purposes of the

contract. Taken together, the Loan Documents serve the purpose of providing the necessary funding for the Project, and the documents at issue here address the terms under which Ibrahim could obtain the 504 Loan from CDC, acting on behalf of the SBA. Both the Sunnyland Note and the 504 Loan created an obligation for the lenders—Sunnyland and CDC, respectively—to loan Ibrahim money that it would then be liable to repay under the terms of those loans. The lenders agreed between themselves to subordinate one of the loans, but there is no indication that this was for Ibrahim's benefit or that the loan documents required some additional terms to effectuate the intent of the parties beyond those expressly provided in the relevant agreements. Nothing in the Loan Documents constitutes "an express promise that cannot reasonably be performed absent some type of performance by [another] party," and, thus, we need not "imply a return promise so that the dealings of the parties can be construed to mean something rather than nothing at all." *See Fielding*, 289 S.W.3d at 850. Accordingly, we reject Ibrahim's argument that the documents reflect an "implied" promise in this case. *See id.*

Ibrahim also asserts that construing these documents as CDC contends they must be construed would make CDC's agreement with Sunnyland "a meaningless promise," arguing that CDC "agreed to obtain a written agreement that prohibited Sunnyland from enforcing its note without consent, but now CDC claims it had no obligation to actually provide its consent or to enforce that provision." It relies on

cases holding that courts should avoid interpreting contracts in a manner that renders a provision meaningless. *See, e.g.*, *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). However, the construction that the Standby Creditor's Agreement and other subordination provisions in the Loan Documents were entered into between CDC and Sunnyland for their own benefit does not render the provisions meaningless. The subordination terms created a *right* that CDC could choose to enforce. It is not necessary that the terms also create a corresponding *obligation* to do so in order to have meaning. And nothing in the Loan Documents indicates that CDC did not retain the right to waive performance of any aspect of those provisions.

We conclude that CDC established, as a matter of law, that nothing in the Loan Documents obligated it to enforce the Standby Creditor's Agreement with Sunnyland, and, accordingly, we conclude that the trial court properly granted CDC's motion for summary judgment on this ground.

## C. Ibrahim's Remaining Claims Against CDC

Ibrahim also asserted causes of action for promissory estoppel/detrimental reliance, fraud, and negligent misrepresentation against CDC. CDC asserted, in its motion for summary judgment and on appeal, that Ibrahim provided no evidence of any promise to Ibrahim that could support a claim for promissory estoppel; there was no evidence that it made any representation on this matter to Ibrahim; and that

38

it made no statement to Ibrahim that could support a claim for negligent misrepresentation. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (providing that elements of fraud include "that a material representation was made" and that "the representation was false"); *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (holding that elements of neglegent misrepresentation include that person made representation "in the course of his business, or in a transaction in which he has a pecuniary interest" and that person "supplies 'false information' for the guidance of others in their business"); *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 378–79 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that elements of promissory estoppel are (1) promise, (2) foreseeability of reliance by promisor, and (3) substantial reliance by promisee to his detriment) (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)).

Ibrahim based its claims on these causes of action on the same arguments set out above—that the obligations created by the Loan Documents constituted a representation by CDC to Ibrahim that CDC would enforce the Standby Creditor's Agreement and other subordination provisions to prevent Sunnyland from collecting or attempting to collect the amounts due on the Sunnyland Note until after the 504 Loan was fully discharged. As discussed above, nothing in the Loan Documents can be construed as such a representation. Ibrahim did not provide any

other summary judgment evidence identifying any promise or representation made outside of those memorialized in the Loan Documents. Accordingly, the trial court correctly granted summary judgment dismissing these causes of action.[6]

We overrule Ibrahim's first issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Goodman.

---

[6] In the trial court, Ibrahim also sought a declaratory judgment that the amount due and owing to Sunnyland under the final judgment in the Sunnyland Note Suit be paid into the registry of the Court and credited to the debt owed by Ibrahim to the CDC. However, it does not challenge the trial court's judgment dismissing this declaratory judgment claim on appeal. *See Asset Prot. & Sec. Servs., L.P. v. Armijo*, 570 S.W.3d 377, 382 (Tex. App.—El Paso 2019, no pet.) ("Our power of review in civil cases is constrained by what arguments appear in the parties' briefs and we cannot address unassigned error.") (citing *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998) (per curiam)).